IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KATHY HOGAN,

            Plaintiff,

    v.

TOWNSHIP OF HADDON, et al.

            Defendants.

HON. JEROME B. SIMANDLE

Civil No. 04-2036 (JBS)

**OPINION**

APPEARANCES:

F. Michael Daily, Jr., Esq.
Sentry Office Plaza,
216 Haddon Avenue, Suite 100
Westmont, NJ 08108
    Attorney for Kathy Hogan

Robert A. Baxter, Esq.
KELLEY, WARDELL, CRAIG, ANNIN & BAXTER, LLC
41 Grove Street
Haddonfield, NJ 08033
    Attorney for Defendant Township of Haddon

Louis R. Moffa, Jr., Esq.
Emily J. Daher, Esq.
BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
Plaza 1000
Main Street, Suite 500
Voorhees, NJ 08043
    Attorneys for Defendant William Park

**SIMANDLE**, District Judge:

    This matter comes before the Court upon the motion of Defendants Township of Haddon ("Township") and William Park ("Park") (collectively, the "Defendants") for summary judgment. The instant lawsuit involves claims that Park, as the Mayor of the Township, (1) violated Hogan's First Amendment rights under

the U.S. Constitution and New Jersey State Constitution by preventing her from speaking at Township commissioners' meetings and using Township services (such as the Township's monthly newsletters) and retaliated against her for criticizing Township policies and personnel and (2) violated Hogan's due process and equal protection rights.  Park and the Township (collectively, the "Defendants") jointly move for summary judgment arguing that (1) Defendant Park is entitled to legislative immunity or, in the alternative, qualified immunity, with respect to Plaintiff Kathleen Hogan's First Amendment violation claim; and (2) that the Township is also entitled to summary judgment.  For the reasons expressed in this Opinion, the Court will grant Defendants' motion for summary judgment.[1]

## I.   BACKGROUND

Plaintiff is Kathleen Hogan ("Hogan"), a resident of the Township of Haddon, New Jersey.  In May 2003, Hogan was elected as a commissioner of the Township along with Defendant William Park ("Park") and William Broderick ("Broderick").  Park, who had been a commissioner and mayor of the Township for a number of years, asked Hogan to be his running mate for the May 2003

---

[1]  At oral argument, counsel for Hogan conceded that summary judgment was appropriate as to Hogan's equal protection and due process claims.  As such, Hogan's claims of a violation of her equal protection and due process rights (Counts 2 and 3 of the complaint) will be dismissed and the only issue remaining before the Court is whether Defendants Park and the Township violated Hogan's First Amendment rights.  .

2

Township commissioner election.  Hogan, Park and Broderick serve as the commissioners in the three-commissioner form of government that operates under the authority and guidelines of the Walsh Act, N.J. Stat. Ann. 40:72-1, et seq.[2]  At an organizational meeting shortly after the 2003 election, Park was re-elected mayor of the Township.

A.   **The Relationship between Hogan and Park Sours Soon After the 2003 Election**

Shortly after the 2003 election, Hogan became upset when she learned that she was not entitled to health insurance as part of her compensation as a part-time Township commissioner.  At a November 25, 2003 commissioners' meeting, Hogan expressed her surprise at the lack of Township-provided health insurance benefits.  Hogan made a motion that health benefits be provided to the commissioners and paid for by the Township.  Neither Park nor Broderick seconded the motion and the motion failed.  At a December 9, 2003 meeting of the commissioners, Hogan again expressed concern with the lack of support evidenced by Park and Broderick's failure to second her motion for paid health insurance benefits and noted that their relationship over the

---

[2]  Under the Walsh Act, municipalities in the State of New Jersey are permitted to adopt a non-partisan commission form of government.  The commissions are composed of either 3 or 5 members and the commissioners elect one commissioner to serve as mayor. The mayor is only responsible for his or her departments and serves as the chair of the commission.

3

next three and a half years would be negatively affected by their lack of support for her.[3]

Hogan's comments proved prophetic.  Over the next two years, relations between Hogan and Park severely deteriorated. Relations between the two commissioners reached a particularly low point when Hogan filed this action against Park and the Township, alleging that Park took numerous actions which limited Hogan's right to communicate with the public, limited her right to obtain information regarding the Township's government and retaliated against her for criticizing Township policies and personnel.  Specifically, the Complaint alleges that:

- Upon taking office, Hogan ordered a phone for her office but several orders for phone services were cancelled allegedly at the direction of Park.  As a result, according to Hogan, installation of her phone was delayed;

- Park personally went to the publisher of the Haddon Township Monthly Monitor (the "Monthly Monitor"), the town newspaper, and demanded that several of Hogan's articles not be published, that her column (titled "The Real Deal" that appeared alongside columns written by the mayor and by the Township chief of police) be terminated, and that her name be removed from other articles that she authored and submitted for publication;

- Park prevented Hogan from accessing the Township's cable access channel and from posting content on the Township's official web site;

---

[3]  Park and Broderick later agreed to allow Hogan to be paid an additional $1,000 toward her health insurance premiums under the Township's health insurance plan for employees.

4

- Park conducted meetings as "mayor" without advising the other commissioners of the date, time, location or agenda of the meetings or inviting the other two commissioners to participate;

- Park refused Hogan's request for information about and a copy of Park's official calendar;

- Park refused to provide certain information regarding Township personnel information regarding Township money spent on Park's attendance of the New Jersey League of Municipalities Conference, and prevented Hogan from obtaining tapes of past commissioners' meetings (through the Township Clerk);

- Park refused to provide Hogan with the results of an audit performed by an outside vendor after the Township's computer system (operated by Kris Mustachio) "crashed" resulting in the permanent loss of certain Township tax and financial data;

- Park consistently "gaveled" her down at public meetings and did not allow her to speak;

- When voting on Township business, Park and Commissioner Broderick consistently out-voted Park by a 2-to-1 margin;

- Park repeatedly "stonewalled" Hogan when Hogan attempted to discuss the job performance of other Township employees;

- Park assaulted Hogan by "elbowing" her after a commissioners' meeting; and

- Park generally harassed her in retaliation for Hogan's speaking out against Park's political agenda.

B.  **Hogan's History of Voicing Her Concerns**

It is clear from the record that Hogan has had opportunities to speak her mind in writing regarding issues associated with the governance of the Township.  By her own estimate, she has authored and distributed more than a hundred handouts since her

5

election in May 2003.  On June 1, 2004, Hogan sent a letter to
all Township employees expressing her views about the need for,
and potential benefits of, a new police station.  In July 2005,
Hogan sent a letter to the homes of several Township police
officers expressing her views on the hiring practices in the
Township's police department.  In November of 2005, while the
Township was considering undertaking a major redevelopment
project, Hogan sent an email urging residents of the Township to
undermine a developer's efforts to show the Township's residents
certain redevelopment projects that the developer had completed
around New Jersey.  According to Defendants, Hogan has also had
the opportunity to make her views known at public meetings as she
has never been prevented or physically restrained from speaking
at any public meetings or to anyone outside of a commissioners'
meetings.

     **C.**  **Procedural History**

     Hogan filed this action on April 30, 2004, seeking relief
under 42 U.S.C. § 1983 and alleging three-counts: (1) violation
of her First Amendment right to free speech; (2) violation of
Hogan's due process and equal protection in violation of the
Fifth and Fourteenth Amendments; and (3) violation of Hogan's
free speech, due process and equal protection rights guaranteed

by the New Jersey State Constitution.[4]  After an unsuccessful
attempt to mediate this matter, Defendants filed this motion for
summary judgment on March 9, 2006. [Docket Item No. 28.]  Hogan
filed opposition to Defendants' motion on May 6, 2006 to which
Defendants responded on May 26, 2006. [Docket Item Nos. 33 and
35, respectively.]  In the wake of the recent U.S. Supreme
Court's decision in <u>Garcetti v. Ceballos</u>, __ U.S. __, 126 S. Ct.
1951 (2006), with the Court's permission and Hogan's consent,
Defendants filed an additional reply on June 6, 2006.

The Court heard oral argument on Defendants' motion on July
19, 2006.  At the conclusion of oral argument, the Court
instructed Hogan to supply a supplemental affidavit identifying
and submitting the articles Hogan wrote for the Monthly Monitor
that were allegedly either blocked from publication or altered by
Park. [Docket Item No. 37, 38.]  The Court also accepted a letter
brief from Park and the Township in response to Hogan's
affidavit. [Docket Item No. 39.]

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of

---

[4]  As mentioned <u>supra</u>, counsel for Hogan has conceded that
summary judgment was appropriate with respect to all claims under
the due process and equal protection clauses.  (Pl.'s Opp. Br. at
1.)

law."[5]  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, the court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving
party's evidence 'is to be believed, and all justifiable
inferences are to be drawn in [that party's] favor.'"  Hunt v.
Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986).  The threshold inquiry is
whether there are "any genuine factual issues that properly can
be resolved only by a finder of fact because they may reasonably
be resolved in favor of either party."[6]  Liberty Lobby, 477 U.S.
at 250; Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 329-
30 (3d Cir. 1995) (citation omitted).

## III. DISCUSSION

Defendants move for summary judgment on the basis that
because Park's actions were taken as part of his legitimate

---

[5] A dispute is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the non-moving party."
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
fact is "material" only if it might affect the outcome of the
suit under the applicable rule of law.  See id.  Disputes over
irrelevant or unnecessary facts will not preclude a grant of
summary judgment.  See id.

[6] The moving party always bears the initial burden of
showing that no genuine issue of material fact exists, regardless
of which party ultimately would have the burden of persuasion at
trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);
Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056,
1061-63 (3d Cir. 1991).

legislative function, he is entitled to legislative immunity.  In the alternative, Park is entitled to qualified immunity as Hogan has failed to present evidence that her constitutional rights were violated.  Moreover, because Hogan has failed to prove that Park was acting "under color of law," Park cannot be held personally liable for any alleged violation of Hogan's constitutional rights.  Finally, because the Court finds that Park is not liable for a violation of Hogan's constitutional rights and because Hogan has failed to present evidence of a law, policy, custom or rule that the Township implemented against her in violation of her First Amendment rights.

**A.    Park is Entitled to Legislative Immunity**

Defendants argue that the doctrine of legislative immunity shields Park and the Township from liability in this matter. Specifically, Defendants argue that, when Park was partaking in actions that allegedly violated Hogan's First Amendment rights, he was engaging in legislative activities involving discretionary decision-making for which he is entitled to absolute immunity.[7]

It is well settled that state, city and municipal legislators enjoy absolute immunity from suit and liability for their legislative activities.  See Bogan v. Scott-Harris, 523

_____

[7]  Hogan does not directly address Defendants' legislative immunity argument in her opposition papers.

U.S. 44, 49 (1998); see also Tenny v. Brandhove, 341 U.S. 367, 373 (1951).  In Tenny, the Supreme Court held:

> The reason for the privilege is clear.  It was well summarized by James Wilson, an influential member of the Committee of Detail which was responsible for the provision in the Federal Constitution. "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence."

Tenny, 341 U.S. at 373.  Under Bogan, the Supreme Court specified that local legislators and city officials were immune from liability for claims brought under 42 U.S.C. § 1983 for their legislative activities.  Bogan, 523 U.S. at 49.

A city official's immunity, however, attaches only when the official is acting "in the sphere of legitimate legislative activity."  Id. at 55 (citing Tenney, 341 U.S. at 376.)  Whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it."[8] Id.[9]  Legislative acts are not ministerial duties, but rather

---

[8]  Officials outside the legislative branch are also entitled to immunity when they perform their legislative function.  See Edwards v. United States, 286 U.S. 482, 490 (1932).

[9]  In Bogan, the defendant mayor, through the process of passing an ordinance and submitting and approving a budget, eliminated the job of a city administrator.  See Bogan, 523 U.S. at 46-47.  In response, the city administrator filed a § 1983 action against the mayor.  Id.  The Supreme Court held that the mayor's acts of voting for an ordinance that eliminated a

are those the legislator's exercise of discretionary powers.  Id.
at 50; see Youngblood v. DeWeese, 352 F.3d 836, 842 (3d Cir.
2003); compare Montgomery County Comm'rs v. Montgomery County,
215 F.3d 367, 377 (3d Cir. 2000)(firing of an employee is not a
legislative act entitled to absolute immunity).

     As a commissioner in the form of government authorized by
the Walsh Act, Park performed both executive and legislative
functions.  Many of the actions taken by Park that Hogan claims
violated her First Amendment rights where performed as part of
his legislative function.  Because Hogan is entitled to absolute
immunity for legislative acts, the Court will grant summary
judgment in favor of Park with respect to certain of the acts
Hogan claims violated her First Amendment Rights, because Park is
protected by legislative immunity.

     First, Hogan alleges that Park "gaveled" her at
commissioners' meetings and refused to let her speak.  Refusing
to allow someone to speak in order to keep a meeting on schedule
is the type of legislative act immunity is afforded to as
contemplated by the Bogan and Tenny courts.  Setting and keeping

_____

position in city government was a "quintessentially legislative"
act and that introducing a budget and signing it into law were
"formally legislative, even though [the mayor] was an executive
official."  Id. at 55.  The ordinance "reflected a discretionary,
policymaking decision implicating the budget priorities for the
city and the services the city provides to its constituents."
Id. at 55-56.

a legislative meeting agenda involves discretionary, policymaking decisions on the part of the legislator.  As such, Park is entitled to absolute immunity for such acts.  Second, any claim by Hogan that Park and Commissioner Broderick out-voted her obviously must also be dismissed as legislative acts for which Park is entitled to absolute immunity.  Finally, Park is also entitled to immunity related to Hogan's allegation that Park interfered with her efforts to get phone service in her office. Hogan's claim centers on the fact that her legislative office telephone was not installed immediately.  As Park testified to at his deposition, immediate installation, however, would have required installation over a weekend and forced the Township pay overtime rates for the installation.  (Park Dep. Tr. at 34.) Park made the decision that, due to budgetary concerns, the Township would not pay for a weekend installation at overtime rates.  Id.  Similar to the holding in Bogan, an action taken by a public official implicating budget concerns is entitled to legislative immunity.  Bogan, 523 U.S. at 55.  Park's personal motive or intent in delaying the telephone is immaterial where the nature of his act was legislative.  Id.  As such, summary judgment will be granted as to Park with respect to these claims.

### B.   **Park is Entitled to Qualified Immunity**

Defendants next argue that, as a government official, Park is entitled to qualified immunity.  Specifically, Defendants

contend that summary judgment is appropriate as to Park because Hogan cannot establish a prima facie case showing a violation of her constitutional rights.  Defendants also argue that, even if the Court finds Park's actions constitute a constitutional infringement, the rights Hogan claims have been violated were not "clearly established" by law and therefore, Hogan is entitled to qualified immunity.

Under the doctrine of qualified immunity, public officials performing discretionary duties within the scope of their employment are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The privilege is more than a defense to liability; it is an immunity from suit. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  In determining whether a public official is immune from suit, a court must first inquire whether "the facts alleged show the officer's conduct violated a constitutional right." Id. at 201. If a plaintiff fails to establish that a constitutional right was violated, the matter of qualified immunity is obviated and the inquiry ends. See id.  If, however, a violation could be ascertained when the facts are viewed in the light most favorable to the party asserting the injury, a court must then inquire whether the right

was "clearly established" at the time of the official's allegedly
unlawful conduct.  Id.  In making that determination, the
relevant inquiry is "whether it would be clear to a reasonable
[official] that his conduct was unlawful in the situation he
confronted."  Id. at 202.

### 1.   Whether Park's Conduct Violated Hogan's First Amendment Rights

This Court's first inquiry is whether "the facts alleged
show the [official's] conduct violated a constitutional right."
Saucier, 533 U.S. at 201.  In support of their position that
Park's conduct did not violate Hogan's constitutional rights,
Defendants first argue that under Garcetti v. Ceballos, ___ U.S.
___, 126 S. Ct. 1951 (2006), Hogan, as a public employee making
statements pursuant to her official duties, has no personal First
Amendment rights.  Second, Defendants argue that Hogan has failed
to present any evidence that Park violated her First Amendment
rights.

### a.   Hogan's First Amendments Rights After Garcetti v. Ceballos

Hogan contends that her First Amendment rights were violated
when Park directed the publisher of the Monthly Monitor to
withhold from publication or remove her name from the by-line of
a number of articles authored by Hogan and submitted to the
Monthly Monitor for publication.  (Supp. Aff. of Kathleen Hogan
¶¶ 2-9.)  Hogan contends that Park directed such actions despite

the fact that both he and Chief of Police Gallagher had their own regular columns in the Monthly Monitor.  (Id. ¶¶ 10, 11.) According to Hogan, the Monitor was a "limited forum" in which elected and other officials could provide information to the public.  As a limited forum, the exclusion of a speaker is an action subject to strict scrutiny.[10]  (Pl.'s Opp. Br. at 9 citing Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992)).  In addition, Hogan also alleges that Park violated Hogan's First Amendment rights when he blocked Hogan's attempts to access the Township's cable access channel and web site.

This Court, following the U.S. Supreme Court's holding in Garcetti, concludes that, because her submissions were made in her capacity as a Township commissioner (and not a private citizen), Hogan has no First Amendment rights in anything submitted to the Monthly Monitor or that she might say on the Township's cable channel or post on the Township's web site. Moreover, the Township owns and operates the Monthly Monitor, its cable channel and its official web site, and has the right to control the content published in or contained on it.  As such,

---

[10]   Defendants argue that this is no longer the state of the law.  Rather, according to Defendants, the Supreme Court has recently taken the position that regulation of speech in a limited public forum may survive under a test that is less exacting than the strict scrutiny standard.  See Good News Club v. Milford Central School, 533 U.S. 98, 106 (2001).

Hogan's claims regarding the Monthly Monitor and the Township's cable channel and web site shall be dismissed.

In Garcetti, the Supreme Court held that, when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes. Garcetti, 126 S. Ct. at 1961.[11]  As such, the First Amendment does not insulate their communications from employer discipline. Id.[12]  In Garcetti, an employee-deputy district attorney, as part of his official duties, drafted a memo criticizing an affidavit the police used to obtain a critical search warrant and then

_____

    [11]  Approximately two months after the Supreme Court's decision in Garcetti, the Third Circuit Court of Appeals applied Garcetti in Hill v. Borough of Kutztown, 455 F.3d 225, 241-242 (3d Cir. 2006).  In Hill, a former borough manager of Kutztown, Pennsylvania sued the borough and its mayor, alleging that the mayor harassed and constructively discharged the manager in violation of, among other things, the manager's freedom of speech.  Id. at 230-32.  In discussing whether the borough manager's speech was protected by the First Amendment (contained in a report made as part of his official duties), the Third Circuit held:

> A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made.

Id. at 241-42 (citing Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951, 1958 (2006).

    [12]  See Hill, 455 F.3d at 242 ("A public employee does not speak 'as a citizen' when he makes a statement 'pursuant to [his] official duties.'"(citing Garcetti, ____ U.S. ___, 126 S. Ct. at 1960.))

recounted his observations about the affidavit at a hearing on a defense motion challenging the warrant.  Id. at 1955-56. Claiming that he was later retaliated against by his employer for his speaking out, the employee filed a § 1983 action asserting violations of the First and Fourteenth Amendments.  Id. at 1956. The Court held that the proper inquiry is first whether the employee spoke as a citizen on a matter of public concern.  Id. at 1958-59.  If the answer is no, the employee has no First Amendment cause of action based on the employer's reaction to the speech because the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.  Id. at 1958. ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance of the efficient provision of public services.")[13]

     In Garcetti, the Court concluded that the statements made by the employee were made pursuant to his official duties as a deputy district attorney, and, therefore, he was not speaking as

_____

     [13]  The Court also noted that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance."  Garcetti, 126 S. Ct. at 1962.  Thus, the "dictates of sound judgment are reinforced by the powerful network of legislative enactments - such as whistle-blower protection laws and labor codes - available to those who seek to expose wrongdoing."  Id. at 1961.  The First Amendment, however, does not shield the speaker from discipline for speech the employee makes pursuant to his or her professional duties.  Id. (citing Crawford-El v. Britton, 523 U.S. 574, 593-94 (1998)).

a citizen for First Amendment purposes.  Id. at 1960.
Accordingly, the Constitution does not insulate his
communications from employer discipline.  Id.  Such a
restriction, according to the Court, "simply reflects the
exercise of employer control over what the employer itself has
commissioned or created."  Id.   Indeed, the Court held that it
was following prior precedent which established an employer's
heightened interests in controlling speech made by an employee in
his or her professional capacity.  Id. ("Official communications
have official consequences, created a need for substantive
consistency and clarity [and that] [s]upervisors must ensure that
their employees' official communications are accurate,
demonstrate sound judgment, and promote the employer's mission.")

     Here, it is clear that Hogan's actions of (1) writing
articles and a column for the Monthly Monitor and (2) seeking
access to the Township's cable access channel and web site were
undertaken as part of her official duties and in her capacity as
a Township commissioner (and Township employee), rather than a
private citizen.  For example, in Hogan's by-lined article for
"The Real Deal" #3 (dated August 4, 2003 and addressing the
Township's redevelopment efforts) that was allegedly "pulled" by
Park, Hogan writes almost exclusively in the third person.
(Hogan Supp. Aff. ¶ 2, Ex. A.)  The Court assumes that Hogan, in
referring to "we" in the article, is writing as a representative

of all three commissioners.  Moreover, only Township officials
(including Mayor Park and Police Chief Gallagher) were permitted
to contribute to the Monthly Monitor.  Thus, it is clear that
Hogan was writing in her official capacity as a commissioner and
not as a private citizen.  See Hill, 455 F.3d at 242 (speech that
is based on a report to a borough council made pursuant to the
speaker's official duties are not protected speech.)  Hence, no
First Amendment protection attached to that article.

In addition, no First Amendment protection attaches to
either of the other three articles that Hogan submitted for
publication in the Monthly Monitor that were allegedly "pulled"
by Park or the two articles in which Hogan's name and contact
information were removed. (Hogan Supp. Aff. ¶¶ 3-5, 8-9 Ex. B-E.)
First, the parties do not dispute that the Monthly Monitor is a
local government-owned and sponsored publication, not a public
forum or a limited public forum.  It is an organ of the
municipality itself.  Because the Monthly Monitor is not a public
or limited public forum, Hogan had no constitutional right to
publish material in the newsletter as a municipal official.

Second, Hogan has presented no evidence that Park ordered
the three articles withheld from publication because of the
viewpoint expressed in them.  Indeed, these three articles -- one
requesting volunteers from the senior citizen community to start
a program teaching seniors about computers, another requesting

19

volunteers for a grant task force, and a third conveying Hogan's experience assisting producers from The Oprah Winfrey Show with their work in the Township -- can not be said to portray Hogan's viewpoint.  (Hogan Supp. Aff. ¶¶ 3-5 Ex. B-D.)  The same is true for the articles in which Hogan's name and contact information were deleted.  Hogan presents no evidence that Park ordered the publisher to withhold the articles because of any viewpoint expressed by Hogan with respect to setting up a meeting for the Historic Preservation or the Haddon Township Arts Alliance.  (Id. ¶¶ 8-9, Ex. E.)[14]

Finally, summary judgment as to Hogan's First Amendment claims for Park's alleged actions of preventing Hogan from using the Township's cable access channel or web site can be granted on similar grounds.  As with the Monthly Monitor, the parties do not dispute that the Township's cable access channel and web site are government-owned and sponsored and as such, are not public or limited public forums.  Thus, Hogan had no constitutional right to use the cable access channel or publish material on the Township's web site.

---

[14]  When a constitutional violation depends on evidence of improper intent, as is the case with claims of violation of the First Amendment and whether the restriction on speech is viewpoint-based, a plaintiff must "identify affirmative evidence from which a jury could find...the pertinent motive," in order to survive summary judgment.  Monteiro v. City of Elizabeth, 436 F.3d 397, 406 (3d Cir. 2006).

b.   **Hogan Fails to Support her Allegations of a Violation of her First Amendment Rights**

Next, Defendants argue that Hogan has failed to show that Park's conduct violated a constitutional right.  In order to survive summary judgment when proof of a constitutional violation depends on evidence of improper intent on the part of the defendant, a plaintiff must present affirmative evidence from which a fact finder could find the relevant motive.  <u>Monteiro</u>, 436 F.3d at 406.  In the context of a First Amendment retaliation claim, a plaintiff must produce evidence demonstrating that "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." <u>McKee v. Hart</u>, 436 F.3d 165, 170 (3d Cir. 2006)(quoting <u>Suppan v. Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000)("[I]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech is always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise. . . .")(internal quotations omitted))  While the effect of the alleged conduct on the employee's freedom of speech need not be great in order to be actionable, "it must be more than <u>de minimis</u>."  <u>Id.</u> (critical statements of an employee's job performance, reprimands and employee's removal from leadership position were <u>de minimis</u>.)  In addition, in <u>Brennan v. Norton</u>, 350 F.3d 399, 419 (3d Cir. 2003), the Third Circuit held that a plaintiff's constitutional rights based on a First Amendment

21

retaliation claim were not <u>de</u> <u>minimis</u> where the public employer
refused to rehire an employee because of the exercise of his
First Amendment rights, or when the employer made decisions
related to promotion, transfer, recall and hiring based on the
employee's exercise of those rights.  According to Defendants,
the record here shows the opposite, namely that Hogan produces no
evidence for any of the First Amendment violations Park is
alleged to have committed.  In the alternative, according to
Defendants, Hogan's claims do not rise above the level of <u>de</u>
<u>minimis</u> acts that would not deter a person of ordinary firmness
from exercising her First Amendment rights.

> **i.   Hogan's Right to Access Park's Daily
> Appointment Calendar and Personnel Files
> of Township Employees**

Hogan argues that Defendants violated her First Amendment
rights when they prevented her, as an elected official, from
obtaining information about official government business in the
form of Park's appointment calendar and certain Township employee
personnel files.  Hogan relies on a number of cases relating to
the public's right to access government functions, administrative
proceedings, trials and meetings under the First Amendment.  <u>See</u>
<u>generally</u> <u>Richmond Newspaper, Inc. v. Virginia</u>, 448 U.S. 555, 575
(1980); <u>United States v. Miami Univ.</u>, 294 F.3d 797, 824 (6th Cir.
2002); <u>Whiteland Woods, L.P. v. Township of West Whiteland</u>, 193
F.3d 177, 181 (3d Cir. 1999).  Hogan does not cite any authority

for her position that a public official who is not allowed
unfettered access to government records can maintain a claim for
violation of the First Amendment, but instead argues that
"[l]ogic informs us that elected official[s] cannot participate
in the governmental process if they are arbitrarily denied
information within the possession of the government."  (Pl.'s
Opp. Br. at 16.)

Hogan offers no case (and this Court's research has found
none) to support her position that the right to access government
information includes a federal constitutional right to an account
of the daily activities of a public official (such as Mayor Park)
or the contents of a Township employee's personnel file.  Indeed,
even the cases cited by Defendant hold that the First Amendment
does not grant a public official unfettered access to government
records.  See Richmond Newspaper, 448 U.S. at 577 (establishing
the right of the public to attend criminal trials but commented
that the right of access under the First Amendment is reserved to
those places traditionally open to the public.)[15]  Here, while
case law cited by Hogan supports the notion that Park could not
exclude Hogan from certain government proceedings, items such as
Park's daily calendar and various Township personnel files are

---

[15]  While its is recognized that a public official's papers
and effects, such as sound recordings, are not privileged from
disclosure to a grand jury as part of a criminal investigation,
see United States v. Nixon, 418 U.S. 683 (1974), Hogan is not a
prosecutor and no such claim is made here.

23

not the types of information traditionally held open to the public, nor can such documents be regarded as "proceedings." Because Hogan has no First Amendment rights to access this information, summary judgment must be granted in favor of Park with respect to these claims.[16]

### iii. Hogan's Claim for Retaliation for Criticizing Public Officials.

Hogan argues that she has presented a prima facie case of retaliation because (1) she engaged in constitutionally-protected activity; (2) Mayor Park responded with retaliation; and (3) the protected activity caused the retaliation. See Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004). Hogan cites the case of Moore v. Asbury Park Bd. of Educ., No. 05-2971, 2005 U.S. Dist. LEXIS 18372, at *35 (D.N.J. Aug. 23, 2005) for the holding that "[t]he ability to question the fitness of community leaders (including school employees), especially in the forum created specifically to foster discussion about a community's school system is an important public interest." (internal citation omitted). Hogan claims that Park retaliated against her in a number of ways in response to her public criticism of Township employees such as Kris Mustacchio, Betty Band, Chief

---

[16] It is certainly possible that Hogan, as commissioner of the Township, is entitled to access Mayor Park's calendar and Township employees' records under the Walsh Act, N.J. Stat. Ann. § 40:72-1 et seq. or the Open Public Meetings Act, N.J. Stat. Ann. § 10:4-6 et seq. (2006). However, such claims were not raised by Hogan and the Court takes no position on them.

Gallagher and Park's secretary Shirley Johnson.  Specifically, Hogan claims Park (a) directed his secretary to have an incident report filed against Hogan related to Hogan's continued efforts to obtain access to the Mayor's schedule, (b) "stone-walled" her attempts to seek out and discuss information regarding the job performance and qualifications of other public employees; (c) assaulted her when Park "elbowed" Hogan outside a commissioners meeting and (d) directed Township staff to refuse to give Hogan a copy of an audit performed after the Township's computer system "crashed."

Even if Hogan had a First Amendment right to criticize Township employees at public meetings where she served as a commissioner, for many of these claims, Hogan has failed to present any evidence to support her allegations and demonstrate that there is a genuine issue of material fact for trial.  First, Hogan admitted at her deposition that she had no evidence to support her claims that Park urged his secretary to file an incident report against her.  (Hogan Dep. Tr. at 120.)  Second, Hogan presents no evidence that Park denied or restricted Hogan's attempts to access the personnel files and job performance of Township employees.  To the contrary, Park presents evidence that Hogan was supplied with the requested personnel information, including Township personnel records of Chief of Police Joseph Gallagher.  (Moffa Decl., Exh. 14.)  Moreover, Hogan admitted

25

that she received Betty Band's resume and qualification after having requested it.  (Hogan Dep. Tr. 91-92.)  Third, Hogan also admitted that, in response to a request, she was provided with a written report concerning the Township's computer "crash" and possible loss of Township records.  Thus, it appears that she was not denied access to the report.

The Court agrees with Defendants that the remaining act of retaliation Park is alleged of doing -- i.e., elbowing Hogan after a Commissioner meeting -- is <u>de</u> <u>minimis</u> and is not an act sufficient to deter a person of ordinary firmness from exercising her First Amendment rights.  Hogan was never physically restrained or prevented from attending or from voicing her views at a public meeting. (Hogan Dep. Tr. at 52.)  Moreover, she admits that she has never been prevented by Park or any Township official from speaking with the press or anyone outside of Commissioner's meetings.  (Hogan Dep. Tr. at 53.)  As such, Hogan's claim of "elbowing" Hogan at a Commissioner's meeting can be characterized as a <u>de</u> <u>minimis</u> act with respect to Hogan's First Amendment rights.  Such a minor disturbance or annoyance, however boorish or uncouth, does not rise to the level of a constitutional deprivation.[17]  The Constitution protects rights

---

[17]  Because this Court finds no violation of Hogan's constitutional rights on the part of Park, the Court need not address the second prong of the qualified immunity test, namely whether Hogan's First Amendment rights were "clearly established" at the time Park violated them.

and freedoms, but it does not enshrine a code of personal civility.

### C.   Mayor Park's Personal Liability

Defendants argue that Hogan cannot maintain a § 1983 claim against Park because Hogan cannot prove that Park was acting "under color of state law," a necessary component to a § 1983 claim.  (Def.'s Reply Br. at 7-8.)  Here, Hogan alleges that Park encouraged (1) his secretary to file an incident report by his secretary, Shirley Johnson, and (2) other township employees to file a lawsuit in retaliation for Hogan's criticism of the Township employees and Park.  However, according to Defendants, Hogan has presented no evidence that Park had any involvement in either the lawsuit filed against her by Township employees or the incident report (and Hogan, in her deposition, admits as much.) (Hogan Dep. Tr. at 120.)  Moreover, Park testified that he had no control over whether Township employees would file suit.  (Park Dep. Tr. at 72, 74.)  This claim thus fails for lack of evidence from which a reasonable jury could find in Plaintiff's favor.

### D.   Liability of the Township

Finally, Hogan argues that the Township is liable for actions of Mayor Park because Mayor Park is the Township's "final decision-maker."  Specifically, Hogan argues that governmental liability attaches where the action taken by a decision-maker who possesses final authority to establish policy with respect to the

action orders -- even in instances where the action is a "one
time" event that is not intended to guide future conduct.  See
Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); Sunkett v.
Misci, 183 F. Supp.2d 691, 711 (D.N.J. 2002)("Section 1983
plaintiffs can establish policy or custom, among other methods,
by identifying a single decision by a final
policymaker.")(internal quotations omitted).  Defendants argue
that Hogan's claims against the Township rely exclusively on
conduct allegedly committed by Park and that because Hogan cannot
maintain a cause of action against Park, Hogan's claims against
the Township fail as a matter of law.

     Local governing bodies can be sued directly under Section
1983 for "monetary, declaratory, or injunctive relief where . . .
the action that is alleged to be unconstitutional implements or
executes a policy statement, ordinance, regulation, or decision
officially adopted and promulgated by that body's officers."
Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690
(1978).  Municipal liability attaches only where execution of a
government's policy or custom, whether made by its lawmakers or
by those whose edicts or acts may fairly be said to represent
official policy, inflicts the injury.  See id. at 694. In the
case of either policy or custom, a plaintiff must show that an
official who has the power to make policy is responsible for
either the affirmative proclamation of a policy or acquiescence

28

in a well-settled custom.  <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir. 1990).

Because Hogan has failed to identify any law, policy, custom, rule or regulation that the Township is implementing against her in violation of her First Amendment rights, this Court will grant summary judgment in favor of the Township.[18] Rather, Hogan rests her claim that the Township is liable exclusively on the actions of Mayor Park under the doctrine of respondeat superior.  Because this Court has held in Section III.A and B <u>supra</u>, that Park is entitled to summary judgment because none of his actions amount to a violation of Hogan's First Amendment rights, Hogan's claim against the Township necessarily also fails.

## IV. CONCLUSION

For the above reasons, Defendants' motion for summary judgment will be granted.  The accompanying Order is entered.


<u>December 1, 2006</u>                    <u>s/ Jerome B. Simandle</u>
DATE                                  JEROME B. SIMANDLE
                                      United States District Judge

---

[18]  As discussed above, Park is one of three commissioners of the Township and nothing he does individually can constitute an official custom or policy of the Township unless ratified by a vote of at least two of the three commissioners.  Indeed, Hogan could not demonstrate, under <u>Pembaur</u>, that Park was a decision-maker who possesses final authority to establish policy with respect to the action orders and, therefore, that his actions constitute a policy or procedure of the Township.